# DEPARTMENT OF TAXATION AND FINANCE OF NEW YORK ET AL. *v.* MILHELM ATTEA & BROS., INC., ET AL.

No. 93–377. Argued March 23, 1994—Decided June 13, 1994

STEVENS, J., delivered the opinion for a unanimous Court.

*G. Oliver Koppell*, Attorney General of New York, argued the cause for petitioners. With him on the briefs were *Robert Abrams*, former Attorney General, *Jerry Boone*, Solicitor General, *Peter H. Schiff*, Deputy Solicitor General, and *Lew A. Millenbach*, Assistant Attorney General.

*Joseph E. Zdarsky* argued the cause for respondents. With him on the brief were *Hans Walker, Jr., Michael Roy, Guy J. Agostinelli*, and *Gerald T. Walsh*.

*Beth S. Brinkmann* argued the cause for the United States as *amicus curiae* urging affirmance. With her on the brief were *Solicitor General Days, Acting Assistant Attorney General Schiffer, Deputy Solicitor General Kneedler, Edward J. Shawaker*, and *Vicki L. Plaut*.*

---

*Briefs of *amici curiae* urging reversal were filed for the State of Connecticut by *Richard Blumenthal*, Attorney General, and *David H. Wrinn*, Assistant Attorney General; for the State of Washington et al. by *Christine O. Gregoire*, Attorney General of Washington, and by the Attorneys General for their respective States as follows: *Grant Woods* of Arizona, *Daniel E. Lungren* of California, *Robert A. Butterworth* of Florida, *Bonnie J. Campbell* of Iowa, *Joseph P. Mazurek* of Montana, *Frankie Sue Del Papa* of Nevada, *Heidi Heitkamp* of North Dakota, *Susan B. Loving* of Oklahoma, *Theodore R. Kulongoski* of Oregon, *Jeffrey B. Pine* of Rhode Island, *Mark Barnett* of South Dakota, *Jan Graham* of Utah, and *James E. Doyle* of Wisconsin; for the Empire State Petroleum Association, Inc., et al. by *Emilio A. F. Petroccione* and *Usher Fogel;* for the National Association of Convenience Stores et al. by *Mark L. Austrian;* for the National Governors' Association et al. by *Richard Ruda;* and for the New York State Association of Tobacco and Candy Distributors, Inc., by *Thomas G. Jackson.*

Briefs of *amici curiae* urging affirmance were filed for the Cheyenne-Arapaho Tribes of Oklahoma et al. by *Melody L. McCoy, Yvonne Teresa Knight, Kim Jerome Gottschalk, Bertram E. Hirsch, Patrick L. Smith, Michael E. Taylor, Jeanne S. Whiteing*, and *Robert S. Thompson III;* for the Muscogee (Creek) Nation by *Michael Minnis, F. Browning Pipestem*, and *Leah Harjo Ware;* for the Oneida Indian Nation of New York by *William W. Taylor III* and *Michael R. Smith;* for the Saint Regis Mohawk Tribe et al. by *Bradley S. Waterman* and *Samuel M. Maruca;* and for the Seneca Nation of Indians by *Timothy B. Dyk* and *Beth Heifetz.*

JUSTICE STEVENS delivered the opinion of the Court.

Cigarette consumers in New York are subject to a state tax of 56 cents per pack. Enrolled tribal members who purchase cigarettes on Indian reservations are exempt from this tax, but non-Indians making purchases on reservations must pay it. To prevent non-Indians from escaping the tax, New York has enacted a regulatory scheme that imposes record-keeping requirements and quantity limitations on cigarette wholesalers who sell untaxed cigarettes to reservation Indians. The question presented is whether New York's program is pre-empted by federal statutes governing trade with Indians.

I

Article 20 of the New York Tax Law imposes a tax on all cigarettes possessed in the State except those that New York is "without power" to tax. N. Y. Tax Law § 471(1) (McKinney 1987 and Supp. 1994). The State collects the cigarette tax through licensed agents who purchase tax stamps and affix them to cigarette packs in advance of the first sale within the State. The full amount of the tax is part of the price of stamped cigarettes at all subsequent steps in the distribution stream. Accordingly, the "ultimate incidence of and liability for the tax [is] upon the consumer." § 471(2). Any person who "willfully attempts in any manner to evade or defeat" the cigarette tax commits a misdemeanor. N. Y. Tax Law § 1814(a) (McKinney 1987).

Because New York lacks authority to tax cigarettes sold to tribal members for their own consumption, see *Moe* v. *Confederated Salish and Kootenai Tribes of Flathead Reservation,* 425 U. S. 463, 475–481 (1976), cigarettes to be consumed on the reservation by enrolled tribal members are tax exempt and need not be stamped. On-reservation cigarette sales to persons other than reservation Indians, however, are legitimately subject to state taxation. See *Washington* v. *Confederated Tribes of Colville Reservation,* 447 U. S. 134, 160–161 (1980). In 1988, New York's Department of Taxa-

tion and Finance[1] determined that a large volume of unstamped cigarettes was being purchased by non-Indians from reservation retailers. According to an affidavit submitted by an official in the Department's Audit Division, the volume of tax-exempt cigarettes sold on New York reservations in 1987–1988 would, if consumed exclusively by tax-immune Indians, correspond to a consumption rate 20 times higher than that of the average New York resident; in 1988–1989, putative reservation consumption was 32 times the statewide average. See Record 244–246 (Affidavit of Jamie Woodward). Because unlawful purchases of unstamped cigarettes deprived New York of substantial tax revenues—now estimated at more than $65 million per year—the Department adopted the regulations at issue in this case.[2]

The regulations recognize the right of "exempt Indian nations or tribes, qualified Indian consumers and registered dealers" to "purchase, on qualified reservations, cigarettes upon which the seller has not prepaid and precollected the cigarette tax imposed pursuant to article 20 of the Tax Law." 20 N. Y. C. R. R. § 336.6(a) (1992). To ensure that nonexempt purchasers do not likewise escape taxation, the regulations limit the quantity of untaxed cigarettes that wholesalers may sell to tribes and tribal retailers. The limitations may be established and enforced in alternative ways. A tribe may enter into an agreement with the Department "to regulate, license, or control the sale and distribution within its qualified reservation of an agreed upon amount of [un-

---

[1] The petitioners in this case are the Department of Taxation and Finance of the State of New York, its Commissioner James W. Wetzler, and the Tax Appeals Tribunal of the State of New York. For convenience we refer to petitioners collectively as the Department.

[2] The cigarette regulations are similar to regulations New York adopted in an effort to prevent sales of untaxed gasoline to non-Indians on reservations. See *Herzog Bros. Trucking, Inc.* v. *State Tax Comm'n*, 69 N. Y. 2d 536, 508 N. E. 2d 914 (1987) (finding regulations pre-empted by federal law), vacated and remanded, 487 U. S. 1212 (1988), on remand 72 N. Y. 2d 720, 533 N. E. 2d 255 (1988).

taxed] cigarettes," in which case wholesalers must obtain the tribe's approval for each delivery of untaxed cigarettes to a reservation retailer. § 336.7(c)(1). In the absence of such an agreement—and apparently there have been none to date—the Department itself limits the permitted quantity of untaxed cigarettes based on the "probable demand" of tax-exempt Indian consumers. § 336.7(d)(1).

The Department calculates "probable demand" in either of two ways. If a tribe "regulates, licenses or controls the sale and distribution of cigarettes within its reservation," the Department will rely upon evidence submitted by that tribe concerning local demand for cigarettes. § 336.7(d)(2)(i).[3] Otherwise, the Department fixes the untaxed cigarette limit for a tribe by multiplying the "New York average [cigarette] consumption per capita" by the number of enrolled members of the affected tribe. §§ 336.7(d)(1), (d)(2)(ii). Each sale of untaxed cigarettes by a wholesaler to a tribe or reservation retailer must be approved by the Department; approval is "based upon evidence of valid purchase orders received by the agent [i. e., wholesaler] of quantities of cigarettes reasonably related to the probable demand of qualified Indian consumers in the trade territory" of the tribe. Ibid.[4] Retailers are sent "Tax Exemption Coupons" entitling them to their monthly allotment of tax-exempt cigarettes. The retailer gives copies of its coupons to the wholesaler upon delivery, and the wholesaler forwards one to the Department. See Brief for Petitioners 12–13; App. 44–45. The Department may withhold approval of deliveries to tribes or re-

---

[3] The regulation cites as examples of such evidence "records of previous sales to qualified Indian consumers, records relating to the average consumption of qualified Indian consumers on and near its reservation, tribal enrollment, or other statistical evidence, etc." 20 N. Y. C. R. R. § 336.7(d)(2)(i) (1992).

[4] The Department determines the "trade territory" in consultation with the tribe if the tribe has undertaken to regulate the sale and distribution of cigarettes; otherwise, the Department determines the trade territory "based upon the information at its disposal." § 336.7(d)(3)(ii).

tailers who "are or have been" violating the regulations, § 336.7(d)(6), and may cancel the exemption certificates of noncomplying tribes or retailers. See §§ 336.6(d)(3), (e)(5).

Wholesalers who wish to sell tax-free cigarettes to Indian tribes or reservation retailers must ensure that the buyer intends to distribute the cigarettes to tax-exempt consumers, takes delivery on the reservation, and holds a valid state tax exemption certificate.[5] Reservation retailers may sell unstamped cigarettes only to "qualified Indian consumers," who at the time of first purchase must provide the retailer with a "certificate of individual Indian exemption" and provide written evidence of their identity for subsequent purchases. §§ 336.6(e)(2), (g)(1).[6]

Wholesale distributors of tax-exempt cigarettes must hold state licenses authorizing them to purchase and affix New York cigarette tax stamps, and must collect taxes on nonexempt sales. §§ 336.7(b)(2), (e). They must also keep records reflecting the identity of the buyer in each tax-exempt sale and make monthly reports to the Department on all such sales. §§ 336.6(g)(3)–(4). New York's regulatory scheme, unsurprisingly, imposes no restrictions on the sale of stamped cigarettes—i. e., those on which taxes have been precollected by wholesalers.

## II

Respondents are wholesalers licensed by the Bureau of Indian Affairs of the United States Department of the Interior (BIA) to sell cigarettes to reservation Indians. Before New

[5] See §§ 336.6(d)(1), (f)(1); § 336.7(b)(1). The purchasing tribe or retailer must display its exemption certificate at the time of first purchase, and must sign an invoice for subsequent purchases. § 336.6(g)(1).

[6] A "qualified Indian consumer" is an enrolled member of one of New York's exempt Indian nations or tribes "who purchases or intends to purchase cigarettes within the boundaries of a qualified reservation for such Indian's own use or consumption (i. e., other than for resale) within such reservation." § 336.6(b)(1)(ii).

York's cigarette tax enforcement scheme went into effect, they filed separate suits in the Supreme Court in Albany County alleging that the regulations were pre-empted by the federal Indian Trader Statutes, 25 U. S. C. § 261 *et seq.* The trial court agreed and issued an injunction. After the Appellate Division affirmed, *Milhelm Attea & Bros., Inc.* v. *Dept. of Taxation and Finance of New York*, 164 App. Div. 2d 300, 564 N. Y. S. 2d 491 (1990), and the New York Court of Appeals denied review, we granted certiorari, vacated the judgment of the Appellate Division, and remanded for further consideration in the light of our decision in *Oklahoma Tax Comm'n* v. *Citizen Band of Potawatomi Tribe of Okla.*, 498 U. S. 505 (1991). 502 U. S. 1053 (1992). On remand, the Appellate Division upheld the regulations, 181 App. Div. 2d 210, 585 N. Y. S. 2d 847 (1992), but the Court of Appeals reversed, 81 N. Y. 2d 417, 615 N. E. 2d 994 (1993).

The Court of Appeals distinguished our decisions holding that a State may require Indian retailers to collect a tax imposed on non-Indian purchasers of cigarettes, see *Moe* v. *Confederated Salish and Kootenai Tribes of Flathead Reservation*, 425 U. S. 463 (1976); *Washington* v. *Confederated Tribes of Colville Reservation*, 447 U. S. 134 (1980), on the ground that those cases involved the regulation of sales to non-Indian consumers. 81 N. Y. 2d, at 425, 615 N. E. 2d, at 997. In the Court of Appeals' view, this case was significantly different because New York's regulations apply to sales by non-Indian wholesalers to reservation Indians. *Ibid.* The court concluded that the Indian Trader Statutes, as construed in *Warren Trading Post Co.* v. *Arizona Tax Comm'n*, 380 U. S. 685 (1965), deprived the States of all power to impose regulatory burdens on licensed Indian traders. 81 N. Y. 2d, at 426–427, 615 N. E. 2d, at 997–998. Even if States could impose minimal burdens on Indian traders, the Court of Appeals alternatively held, New York's regulations are nevertheless invalid because they "impose *significant* burdens on the wholesaler." *Id.*, at 427, 615 N. E. 2d,

at 998. In particular, the regulations "dictate to Indian traders the number of unstamped cigarettes they can sell to reservation Indians and direct with whom they may trade." *Ibid.* Moreover, New York's scheme "requires wholesale distributors to prepay taxes on all cigarettes delivered on the reservations in excess of the predetermined maximum amount and, with respect to those cigarettes, imposes a sales tax on Indian retailers." *Ibid.*

We granted certiorari, 510 U. S. 943 (1993), and now reverse.

## III

Respondents' challenge to New York's regulatory scheme is essentially a facial one. In reviewing a challenge of this kind, we do not rest our decision on consequences that, while possible, are by no means predictable. For example, respondents do not contest the factual accuracy of the Department's initial calculations of "probable demand" for tax-exempt cigarettes at particular reservations, see Record 244–248; rather, they challenge the Department's authority to impose such limits at all. Therefore, for present purposes we must assume that the allocations for each reservation will be sufficiently generous to satisfy the legitimate demands of those reservation Indians who smoke cigarettes. In other respects as well, we confine ourselves to those alleged defects that inhere in the regulations as written.

A second limitation on our review flows from the nature of respondents' challenge. Their claim is that the New York scheme interferes with their federally protected activities as Indian traders who sell goods at wholesale to reservation Indians. While the effect of the New York scheme on Indian retailers and consumers may be relevant to that inquiry, see *Warren Trading Post*, 380 U. S., at 691, this case does not require us to assess for all purposes each feature of New York's tax enforcement scheme that might affect tribal self-government or federal authority over Indian affairs. Here

we confront the narrower question whether the New York scheme is inconsistent with the Indian Trader Statutes.

## IV

Throughout this Nation's history, Congress has authorized "sweeping" and "comprehensive federal regulation" over persons who wish to trade with Indians and Indian tribes. *Warren Trading Post*, 380 U. S., at 687–689. An exercise of Congress' power to "regulate Commerce . . . with the Indian Tribes," see U. S. Const., Art. I, §8, cl. 3, the Indian Trader Statutes were enacted to prevent fraud and other abuses by persons trading with Indians. See *Central Machinery Co. v. Arizona Tax Comm'n*, 448 U. S. 160, 163–164 (1980). The provision principally relied upon by respondents and by the Court of Appeals, enacted in 1876 and captioned "Power to appoint traders with Indians," states:

> "The Commissioner of Indian Affairs shall have the sole power and authority to appoint traders to the Indian tribes and to make such rules and regulations as he may deem just and proper specifying the kind and quantity of goods and the prices at which such goods shall be sold to the Indians." 19 Stat. 200, 25 U. S. C. §261.[7]

In *Warren Trading Post*, we held that this provision prevented Arizona from imposing a tax on the income or gross sales proceeds of licensed Indian traders dealing with reservation Indians. The Indian Trader Statutes and the "apparently all-inclusive regulations" under them, we stated, "would seem in themselves sufficient to show that Congress has taken the business of Indian trading on reservations so

---

[7] The other Indian trader provisions state that persons who establish their fitness to trade with Indians to the BIA's satisfaction shall be permitted to do so, 25 U. S. C. §262, authorize the President to prohibit the introduction of goods into Indian country and to revoke licenses, §263, and impose penalties for unauthorized trading, §264. BIA regulations under the statutes are codified at 25 CFR §§140.1–140.26 (1993).

fully in hand that no room remains for state laws imposing additional burdens upon traders." 380 U. S., at 690. Therefore, Arizona's tax "would to a substantial extent frustrate the evident congressional purpose of ensuring that no burden shall be imposed upon Indian traders for trading with Indians on reservations except as authorized by Acts of Congress or by valid regulations promulgated under those Acts." *Id.*, at 691. See also *Central Machinery Co.*, 448 U. S., at 163–166 (tax on proceeds of sale of farm machinery to tribe preempted by § 261).

Although language in *Warren Trading Post* suggests that no state regulation of Indian traders can be valid, our subsequent decisions have "undermine[d]" that proposition. See *Central Machinery*, 448 U. S., at 172 (Powell, J., dissenting). Thus, in *Moe*, we upheld a Montana law that required Indian retailers on tribal land to collect a state cigarette tax imposed on sales to non-Indian consumers. We noted that the Indian smokeshop proprietor's competitive advantage over other retailers depended "on the extent to which the non-Indian purchaser is willing to flout *his* legal obligation to pay the tax. Without the simple expedient of having the retailer collect the sales tax from non-Indian purchasers, it is clear that wholesale violations of the law by the latter class will go virtually unchecked." 425 U. S., at 482. In contrast to the tax in *Warren Trading Post*, which fell directly upon an Indian trader, the cigarette tax in *Moe* fell upon a class—non-Indians—whom the State had power to tax. 425 U. S., at 483. We approved Montana's "requirement that the Indian tribal seller collect a tax validly imposed on non-Indians" as a "minimal burden designed to avoid the likelihood that in its absence non-Indians purchasing from the tribal seller will avoid payment of a concededly lawful tax." *Ibid.*

In *Colville*, we upheld in relevant part a more comprehensive Washington State cigarette tax enforcement scheme that required tribal retailers selling goods on the reservation

to collect taxes on sales to nonmembers and to keep extensive records concerning these transactions. We rejected the proposition that "principles of federal Indian law, whether stated in terms of pre-emption, tribal self-government, or otherwise, authorize Indian tribes thus to market an exemption from state taxation to persons who would normally do their business elsewhere." 447 U. S., at 155. Moreover, the Tribes had failed to meet their burden of showing that the recordkeeping requirements imposed on tribal retailers were "not reasonably necessary as a means of preventing fraudulent transactions." *Id.*, at 160.[8] See also *California Bd. of Equalization* v. *Chemehuevi Tribe*, 474 U. S. 9, 11–12 (1985) *(per curiam).*

In *Potawatomi*, we held that sovereign immunity barred the State of Oklahoma's suit against a Tribe to recover cigarette taxes owed for sales to non-Indians at a convenience store owned by the Tribe. In response to the State's protest that the Tribe's immunity from suit made the State's recognized authority to tax cigarette sales to non-Indians a "right without any remedy," 498 U. S., at 514, we explained that alternative remedies existed for state tax collectors, such as damages actions against individual tribal officers or agreements with the tribes. *Ibid.* We added that "States may of course collect the sales tax from cigarette wholesalers, either by seizing unstamped cigarettes off the reservation, *Colville*, [447 U. S.,] at 161–162, or by assessing wholesalers

---

[8] We described the recordkeeping requirements as follows:

"The state sales tax scheme requires smokeshop operators to keep detailed records of both taxable and nontaxable transactions. The operator must record the number and dollar volume of taxable sales to nonmembers of the Tribe. With respect to nontaxable sales, the operator must record and retain for state inspection the names of all Indian purchasers, their tribal affiliations, the Indian reservations within which sales are made, and the dollar amount and dates of sales. In addition, unless the Indian purchaser is personally known to the operator he must present a tribal identification card." *Colville*, 447 U. S., at 159.

who supplied unstamped cigarettes to the tribal stores."
*Ibid.*

## V

This is another case in which we must "reconcile the plenary power of the States over residents within their borders with the semi-autonomous status of Indians living on tribal reservations." *McClanahan* v. *Arizona Tax Comm'n*, 411 U. S. 164, 165 (1973). Resolution of conflicts of this kind does not depend on "rigid rule[s]" or on "mechanical or absolute conceptions of state or tribal sovereignty," but instead on "a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law." *White Mountain Apache Tribe* v. *Bracker*, 448 U. S. 136, 142, 145 (1980). See also *Cotton Petroleum Corp.* v. *New Mexico*, 490 U. S. 163, 176 (1989).

The specific kind of state tax obligation that New York's regulations are designed to enforce—which falls on non-Indian purchasers of goods that are merely retailed on a reservation—stands on a markedly different footing from a tax imposed directly on Indian traders, on enrolled tribal members or tribal organizations, or on "value generated on the reservation by activities involving the Tribes," *Colville*, 447 U. S., at 156–157. *Moe, Colville,* and *Potawatomi* make clear that the States have a valid interest in ensuring compliance with lawful taxes that might easily be evaded through purchases of tax-exempt cigarettes on reservations; that interest outweighs tribes' modest interest in offering a tax exemption to customers who would ordinarily shop elsewhere. The "balance of state, federal, and tribal interests," *Rice* v. *Rehner*, 463 U. S. 713, 720 (1983), in this area thus leaves more room for state regulation than in others. In particular, these cases have decided that States may impose on reservation retailers minimal burdens reasonably tailored to the collection of valid taxes from non-Indians.

Although *Moe* and *Colville* dealt most directly with claims of interference with tribal sovereignty,[9] the reasoning of those decisions requires rejection of the submission that 25 U. S. C. §261 bars any and all state-imposed burdens on Indian traders. It would be anomalous to hold that a State could impose tax collection and bookkeeping burdens on reservation retailers who are themselves enrolled tribal members, including stores operated by the tribes themselves, but that similar burdens could not be imposed on wholesalers, who often (as in this case) are not.[10] Such a ruling might well have the perverse consequence of casting greater state tax enforcement burdens on the very reservation Indians whom the Indian Trader Statutes were enacted to protect. Just as tribal sovereignty does not completely preclude States from enlisting tribal retailers to assist enforcement of valid state taxes, the Indian Trader Statutes do not bar the States from imposing reasonable regulatory burdens upon Indian traders for the same purpose. A regulation designed to prevent non-Indians from evading taxes may well burden Indian traders in the sense that it reduces the competitive advantage offered by trading unlimited quantities of tax-free goods; but that consideration is no more weighty in the case of Indian traders engaged in wholesale transactions than it was in the case of reservation retailers.

The state law we found pre-empted in *Warren Trading Post* was a tax directly "imposed upon Indian traders for trading with Indians." 380 U. S., at 691. See also *Central Machinery*, 448 U. S., at 164. That characterization does

---

[9] In fact, in *Colville*, the tribal retailers obligated to collect state taxes on cigarette sales to non-Indians and keep detailed sales records were licensed Indian traders. See *Confederated Tribes of Colville* v. *State of Wash.*, 446 F. Supp. 1339, 1347 (ED Wash. 1978).

[10] According to the Federal Government, there are approximately 125 federally licensed Indian traders in New York, of whom the 64 wholesalers are all non-Indians and the 61 retailers are all Indians. See Brief for United States as *Amicus Curiae* 2, n. 1.

not apply to regulations designed to prevent circumvention of "concededly lawful" taxes owed by non-Indians. See *Moe*, 425 U. S., at 482–483. Although broad language in our opinion in *Warren Trading Post* lends support to a contrary conclusion, we now hold that Indian traders are not wholly immune from state regulation that is reasonably necessary to the assessment or collection of lawful state taxes. That conclusion does not, of course, answer the Court of Appeals' alternative basis for striking down the New York scheme— namely, that it imposes *excessive* burdens on Indian traders.

## VI

Respondents vigorously object to the limitation of wholesaler's tax-exempt cigarette sales through the "probable demand" mechanism. We are persuaded, however, that New York's decision to stanch the illicit flow of tax-free cigarettes early in the distribution stream is a "reasonably necessary" method of "preventing fraudulent transactions," one that "polices against wholesale evasion of [New York's] own valid taxes without unnecessarily intruding on core tribal interests." *Colville*, 447 U. S., at 160, 162. The sole purpose and justification for the quotas on untaxed cigarettes is the State's legitimate interest in avoiding tax evasion by non-Indian consumers. By imposing a quota on *tax-free* cigarettes, New York has not sought to dictate "the kind and quantity of goods and the prices at which such goods shall be sold to the Indians." 25 U. S. C. § 261. Indian traders remain free to sell Indian tribes and retailers as many cigarettes as they wish, of any kind and at whatever price. If the Department's "probable demand" calculations are adequate, tax-immune Indians will not have to pay New York cigarette taxes and neither wholesalers nor retailers will have to precollect taxes on cigarettes destined for their consumption. While the possibility of an inadequate quota may provide the basis for a future challenge to the *application* of the regulations, we are unwilling to assume, in the absence

of any such showing by respondents, that New York will underestimate the legitimate demand for tax-free cigarettes. The associated requirement that the Department preapprove deliveries of tax-exempt cigarettes in order to ensure compliance with the quotas does not render the scheme facially invalid. This procedure should not prove unduly burdensome absent wrongful withholding or delay of approval—problems that can be addressed if and when they arise. See *Colville*, 447 U. S., at 160 (burden of showing that tax enforcement scheme imposes excessive regulatory burdens is on challenger).

New York's requirements that wholesalers sell untaxed cigarettes only to persons who can produce valid exemption certificates and that wholesalers maintain detailed records on tax-exempt transactions likewise do not unduly interfere with Indian trading. The recordkeeping requirements and eligible buyer restrictions in the New York scheme are no more demanding than the comparable measures we approved in *Colville*. See n. 8, *supra*. Indeed, because wholesale trade typically involves a comparatively small number of large-volume sales, the transactional recordkeeping requirements imposed on Indian traders in this case are probably less onerous than those imposed on retailers in *Moe* and *Colville*. By requiring wholesalers to precollect taxes on, and affix stamps to, cigarettes destined for nonexempt consumers, New York has simply imposed on the wholesaler the same precollection obligation that, under *Moe* and *Colville*, may be imposed on reservation retailers. We therefore disagree with the Court of Appeals' conclusion that New York has in this way "impose[d] a sales tax *on Indian retailers*." 81 N. Y. 2d, at 427, 615 N. E. 2d, at 998 (emphasis added). Again assuming that the "probable demand" calculations leave ample room for legitimately tax-exempt sales, the precollection regime will not require prepayment of any tax to which New York is not entitled.

The United States, as *amicus* supporting affirmance, agrees with the Court of Appeals' alternative holding that the New York scheme improperly burdens Indian trading. In addition to the provisions disapproved by the Court of Appeals, the United States attacks the requirement that reservation *retailers* obtain state tax exemption certificates on the ground that it invades the BIA's "sole power and authority" to appoint Indian traders. We do not, however, understand the regulations to do anything more than establish a method of identifying those retailers who are already engaged in the business of selling cigarettes. At this stage, we will not assume that the Department would refuse certification to any federally authorized trader or stultify tribal economies by refusing certification to new reservation retailers. Indeed, the Department assures us that certification is "virtually automatic" upon submission of an application. Reply Brief for Petitioners 5 (citing 20 N. Y. C. R. R. § 336.6(f)(1) (1992)).

The United States also objects to the provisions for establishing "trade territories" and allocating each reservation's overall quota among its retail outlets. Depending upon how they are applied in particular circumstances, these provisions may present significant problems to be addressed in some future proceeding. However, the record before us furnishes no basis for identifying or evaluating any such problem. Agreements between the Department and individual tribes might avoid or resolve problems that are now purely hypothetical.[11] Possible problems involving the allocation of

---

[11] *Amicus* the Seneca Nation argues that New York's cigarette tax regulations violate treaties between it and the United States insofar as the regulations allow New York to tax any transactions occurring on Seneca tribal lands. See Brief for Seneca Nation of Indians as *Amicus Curiae* 18–26; but see Brief for United States as *Amicus Curiae* 21–24. We do not address this contention, which differs markedly from respondents' position and which was not addressed by the Court of Appeals. See *United Parcel Service, Inc.* v. *Mitchell*, 451 U. S. 56, 60, n. 2 (1981).

cigarettes among reservation retailers would not necessarily threaten any harm to respondent wholesalers, whose main interest lies in selling the maximum number of cigarettes, however ultimately allocated.

Because we conclude that New York's cigarette tax enforcement regulations do not, on their face, violate the Indian Trader Statutes, the judgment of the New York Court of Appeals is reversed.

*It is so ordered.*