# Office of the Attorney General
## State of Texas


**DAN MORALES**
ATTORNEY GENERAL

May 30, 1997

Ms. Catherine A. Ghiglieri
Commissioner
Texas Department of Banking
2601 North Lamar Boulevard
Austin, Texas 78705-4294

Opinion No. DM-442

Re: Whether the Department of Banking may enforce the Currency Exchange Act, article 350, V.T.C.S., on a gambling facility owned by the Kickapoo Indians on their reservation in Eagle Pass, Texas (RQ-926)

Dear Commissioner Ghiglieri:

You ask whether the Department of Banking (the "department") has the authority under the Currency Exchange Act, article 350, V.T.C.S. (the "act"), to regulate currency exchange transactions engaged in by a non-Indian management company which manages the casino owned by the Texas Band of Kickapoo Indians on their reservation in Eagle Pass, Texas. Because the act is a civil/regulatory enactment, and because the burden of such regulation falls upon the tribal enterprise rather than on non-Indian customers, the department lacks such authority.

The Currency Exchange Act, article 350, V.T.C.S., requires any person engaged in the exchange of one currency for another as a service or for profit to obtain a license from the department. V.T.C.S. art. 350, § 2. Section 3 of the act exempts banks, foreign bank agencies, credit unions, savings banks, savings and loan associations, persons licensed under the Sale of Checks Act, and persons registered as securities dealers under the Securities Act from this licensure requirement, and permits persons who engage in currency exchange only as an incidental part of their business or as an accommodation to clients or customers to request exemption from the act's requirements by the Banking Commissioner of Texas. Such a license, pursuant to sections 3, 4, and 5 of the act, requires the payment of application fees, license fees, license renewal fees, and examination fees. A license holder is also required to post a surety bond of at least $25,000 for each license held. *Id.* § 10(a).

The question of whether and to what extent state laws such as the act may be imposed upon Indians or within an Indian reservation located within a particular state is frequently asked, and its answer, which is itself somewhat complex, has a long and complex history. Chief Justice Marshall's original rule, enunciated in the landmark case of *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 561 (1832), was that because the Indian tribes were to some extent still nations with elements of

independent sovereignty, states had no jurisdiction within Indian country absent explicit Congressional approval:

> The Cherokee nation, then, is a distinct community, occupying its own territory, with boundaries accurately described, in which the laws of Georgia can have no force, and which the citizens of Georgia have no right to enter, but with the assent of the Cherokees themselves, or in conformity with treaties and with the acts of congress. The whole intercourse between the United States and this nation is, by our constitution and laws, vested in the government of the United States.

While *Worcester*'s bright line rule has been considerably eroded in the intervening century and a half, it remains the case that one of the principal considerations in federal Indian law is the impact of any proposed state regulation on Indian sovereignty. *See, e.g., California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 207 (1987); *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 332 (1983).

State jurisdiction over Indian country, for the purposes of the present inquiry, is generally what is referred to as Public Law 280 jurisdiction. 28 U.S.C. § 1360. In Public Law 280, Congress granted criminal and some civil jurisdiction to the states in which reservations were situated. *See Bryan v. Itasca County, Minn.*, 426 U.S. 373 (1976). The Supreme Court and the Court of Appeals for the Fifth Circuit have over a series of cases articulated a two-step inquiry to analyze whether and to what extent the laws of a state, as distinct from the United States, may be imposed in Indian country. *See Seminole Tribe of Florida v. Butterworth*, 658 F.2d 310 (5th Cir. 1981); *Cabazon Band*, 480 U.S. 202 (1987); *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134 (1980); *Moe v. Confederated Salish and Kootenai Tribes of the Flathead Reservation*, 425 U.S. 463 (1976); *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505 (1991).

The first consideration in this analysis is whether the statute in question is a civil statute which seeks to regulate, or a criminal statute which seeks to prohibit the behavior involved. The second consideration is on whom the burden of regulation falls.

The beginning of the inquiry for our purpose is in the Supreme Court's analysis of Public Law 280 jurisdiction in *Bryan v. Itasca County*, 426 U.S. 373 (1976). In *Bryan*, the question is whether Public Law 280 grants states the power to tax Indian reservation lands or income from on-reservation economic activities. The Court, reversing a judgment of the Minnesota Supreme Court, held that the statute contained no such jurisdictional grant. Rather, in the Court's view, "provision for state criminal jurisdiction over offenses committed by or against Indians on the reservations was the central focus of Pub. L. 280 . . . ." *Bryan*, 426 U.S. at 380. The civil jurisdictional section's "primary intent . . . was to grant jurisdiction over private civil litigation involving reservation Indians in state court." *Id.* at 385.

The United States Court of Appeals for the Fifth Circuit, in *Seminole Tribe of Florida v. Butterworth*, applied the *Bryan* reasoning to a suit for injunctive relief brought by the Seminole tribe to prevent the application of Florida bingo laws to a hall located on their reservation. Noting that Florida did not have a public policy forbidding bingo, the Fifth Circuit found that the statute in question was a "civil/regulatory" one, not a "criminal/prohibitory" one, and accordingly held, "[w]here the state regulates the operation of bingo halls to prevent the game of bingo from becoming a money-making business, the Seminole Indian tribe is not subject to that regulation and cannot be prosecuted for violating the limitations imposed." *Seminole Tribe*, 658 F.2d at 314-15.

The *Seminole Tribe* analysis was adopted by the United States Court of Appeals for the Ninth Circuit in *Barona Group of Capitan Grande Band of Mission Indians v. Duffy*, 694 F.2d 1185 (9th Cir. 1982) and in *Cabazon Band of Mission Indians v. County of Riverside*, 783 F.2d 900 (9th Cir. 1986). *Cabazon Band* was affirmed by the Supreme Court in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), the leading case on state regulation of Indian gambling.

*Cabazon Band* does not stand for "an inflexible *per se* rule precluding state jurisdiction over tribes and tribal members in the absence of express congressional consent." *Cabazon Band*, 480 U.S. at 214-15. But it does require that any extension of such jurisdiction survive a rigorous preemption analysis:

> Decision in this case turns on whether state authority is pre-empted by the operation of federal law; and "[s]tate jurisdiction is pre-empted . . . if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority." The inquiry is to proceed in light of traditional notions of Indian sovereignty and the congressional goal of Indian self-government, including its "overriding goal" of encouraging tribal self-sufficiency and economic development.

*Id.* at 216 (citations omitted).

Weighing the matter, the Court found that these factors favored preemption. The Court specifically distinguished the Indian smoke shop cases, several of which are cited in the department's brief to us, which permit state taxation of on-reservation cigarette sales to non-Indians so as to prevent Indian tribes from marketing a tax exemption:

> Here, however, the Tribes are not merely importing a product onto the reservations for immediate resale to non-Indians. They have built modern facilities which provide recreational opportunities and ancillary services to their patrons, who do not simply drive onto the reservations, make purchases and depart, but spend extended periods of time there enjoying the services the Tribes provide.

*Id.* at 219.

The first question one must consider, therefore, in analyzing state jurisdiction is whether the statute sought to be enforced is criminal/prohibitory or civil/regulatory in nature. As your brief correctly concludes, we believe a court would find that the Currency Exchange Act is, in these terms, a civil/regulatory statute. In this regard we note that it is essentially a licensing statute, which by its terms exempts whole classes of enterprises and permits the Commissioner of Banking discretion to exempt individual enterprises. Little weight, we think, would be afforded to the argument that inspections under the act may lead to criminal referrals for money laundering. In this regard again, we note the Supreme Court's ruling in *Cabazon Band:*

> [T]hat an otherwise regulatory law is enforceable by criminal as well as civil means does not necessarily convert it into a criminal law within the meaning of Pub. L. 280. Otherwise, the distinction between § 2 [criminal jurisdiction] and § 4 [civil jurisdiction] of that law could easily be avoided and total assimilation permitted.

*Id.* at 211.

Since the act is civil/regulatory, we must consider on whom the burden of its imposition falls. Conceding that the civil/regulatory nature of the Currency Exchange Act means that it is not applicable to the Kickapoo Band itself, the department's brief asserts that it may nevertheless be applied to a non-Indian management company which operates the casino for the Kickapoo. As we have noted, the brief generally relies for this proposition on a series of cases relating to the collection of state sales tax, and the maintenance of sales tax and exemption records, by tribal smoke shops on the reservations which sold tax-free cigarettes to non-Indian customers. *See Confederated Tribes of Colville Indian Reservation,* 447 U.S. 134 (1980); *Moe,* 425 U.S. 463 (1976); *Citizen Band of Potawatomi Tribe of Oklahoma,* 498 U.S. 505 (1991); *Department of Taxation & Finance of New York v. Milhelm Attea & Bros., Inc.,* 512 U.S. 61, 114 S. Ct. 2028 (1994).

In our view the smoke shop cases are immediately distinguishable from the issue at hand, for the reason given by the Supreme Court in *Cabazon Band.* The Kickapoo Band is not marketing an exemption from Texas gambling law. *See Cabazon Band,* 480 U.S. at 219. Nor does the department suggest that it is marketing an exemption from the Currency Exchange Act. Indeed, given that currency transactions are subject to federal Bank Secrecy Act monitoring, we do not believe such a contention could be maintained.

Moreover, one of the reasons that the sales tax statutes could be enforced in Indian country was precisely that the legal incidence of the tax was on non-Indian purchasers. There is no authority for states to impose sales tax on cigarette purchases by tribal members in reservation smoke shops. *See Milhelm Attea & Bros.,* 512 U.S. 61, 114 S. Ct. at 2031. Accordingly, the department has asserted that the burden here would fall solely upon the non-Indian management company. In our view, this assertion is both questionable as a factual matter and gainsaid as a legal matter by the only authority which has been recited to us on this point, the United States Court of Appeals for the Tenth Circuit's decision in *Indian Country, U.S.A., Inc. v. Oklahoma Tax Comm'n,* 829 F.2d 967 (10th Cir. 1987).

First, we note that while the legal incidence of the sales tax falls on the non-Indian purchasers in the smoke shop cases, it is by no means clear that the cost of compliance with the Currency Exchange Act, including the significant cost of surety bonding, would fall solely upon the management company. Rather, if a court were to analyze such costs of compliance as part of the cost of doing business for the casino, it would likely find that such costs impermissibly burdened the Kickapoo.

Were there no authority on this question, we would be constrained by our inability to find facts in the opinion process to advise you only that we thought it unlikely that the department has authority to enforce the Currency Exchange Act against the management company. However, based on the authority of *Indian Country*, we find that the department has no such authority.

In *Indian Country*, the state of Oklahoma asserted that it had authority to regulate and to tax bingo operations in a casino on Creek Indian land, which like the casino here was managed by a non-Indian company but owned by the tribe, *inter alia* because the management company was non-Indian. Following the trial court, the Tenth Circuit found that the casino was a tribal enterprise, and that it and the management company were immune from state regulation. In a footnote to this holding, the court wrote:

> The State focuses too narrowly on whether a strict "master-servant" agency relationship exists between the Creek Nation and ICUSA, and suggests that only if ICUSA is such an "agent" can it be afforded immunity from state regulations. We are not persuaded. *The preemption of state laws extends to the Creek Nation tribal bingo enterprise as a whole, which includes the involvement of non-Indians*

*Indian Country*, 829 F.2d at 983 n.7 (emphasis added).

We believe that the *Indian Country* case is on point here, and that, particularly in the absence of contrary authority, it would be followed by the Fifth Circuit. Accordingly, we believe that a court would conclude that the immunity of the Kickapoo Band's gambling enterprise to the application of the Currency Exchange Act extends to the non-Indian management company, and that the Department of Banking is barred from enforcing the Currency Exchange Act against the casino operated by the Texas Band of Kickapoo Indians.

## S U M M A R Y

The Department of Banking is barred from enforcing the Currency Exchange Act, article 350, V.T.C.S., against the casino operated by the Texas Band of Kickapoo Indians.

Yours very truly,

**D A N   M O R A L E S**
Attorney General of Texas

JORGE VEGA
First Assistant Attorney General

SARAH J. SHIRLEY
Chair, Opinion Committee

Prepared by James E. Tourtelott
Assistant Attorney General