White v Schneiderman (2018 NY Slip Op 04028)

White v Schneiderman

2018 NY Slip Op 04028 [31 NY3d 543]

June 7, 2018

Garcia, J.

Court of Appeals

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, September 19, 2018

[*1]

Eric White et al., Appellants,
v
Eric T. Schneiderman, New York State Attorney General, in His Official Capacity, et al., Respondents.

Argued April 25, 2018; decided June 7, 2018

White v Schneiderman, 140 AD3d 1636, affirmed.

{**31 NY3d at 546} OPINION OF THE COURT

Garcia, J.

Plaintiffs assert that enforcement of Tax Law § 471, which imposes requirements on Indian[FN1] retailers located on reservation land to prepay the tax on cigarette sales to individuals who are not members of the Seneca Nation of Indians, is inconsistent{**31 NY3d at 547} with Indian Law § 6 and the Buffalo Creek Treaty of 1842 (7 US Stat 586 [1842]). We hold that because the Tax Law's precollection mechanism does not operate as a direct tax on the retailers or upon members of the Seneca Nation, it does not conflict with either the Treaty or the statute.
I.
Plaintiff Eric White, a member of the Seneca Nation of Indians, operates a convenience store, plaintiff Native Outlet, located on Seneca Nation lands. Through Native Outlet, White sells cigarettes to tribal members and nonmembers, and is therefore subject to Tax Law § 471. The statute provides that the tax shall be imposed "on all cigarettes possessed in the state by any person for sale," including "all cigarettes sold on an Indian reservation to non-members of the Indian nation or tribe," but contains an exception for cigarette "sales to qualified Indians for their own use and consumption on their nations' . . . qualified reservation" (Tax Law § 471 [1]).
Plaintiffs commenced this action seeking (1) a declaration that Tax Law § 471 is unconstitutional and invalid and (2) a permanent injunction enjoining defendants from enforcing the law against them. The complaint alleged that the tax law conflicts with the Buffalo Creek Treaty of 1842 and Indian Law § 6. After plaintiffs moved for a preliminary injunction, defendants cross-moved to dismiss the complaint for failure to state a cause of action. Supreme Court granted defendants' motion and dismissed plaintiffs' motion for a preliminary injunction as moot.
[*2]
The Appellate Division, among other things, modified the judgment by reinstating the complaint to the extent it sought a declaration and granted judgment in favor of defendants, declaring that the tax law is not inconsistent with either Indian Law § 6 or the Treaty (140 AD3d 1636 [4th Dept 2016]). Construing the Treaty and Indian Law § 6 liberally in favor of plaintiffs, the Court nevertheless determined that they were not entitled to declaratory relief in light of Supreme Court precedent holding that "the States have a valid interest in ensuring compliance with lawful taxes that might easily be evaded through purchases of tax-exempt cigarettes on reservations," and to curb that practice, "States may impose on reservation retailers minimal burdens reasonably tailored to the collection of valid taxes from non-Indians" (id. at 1638, quoting 
Department of Taxation & Finance of N. Y. v Milhelm Attea & Bros.,{**31 NY3d at 548} 512 US 61, 73 [1994]). Accordingly, the Court concluded that although the law requires plaintiffs to prepay the amount due as tax, because it is the non-Indian consumers who ultimately have the tax liability, " 'th[e] burden is not, strictly speaking, a tax at all' " (id. at 1638-1639, quoting Moe v Confederated Salish & Kootenai Tribes of Flathead Reservation, 425 US 463, 483 [1976]). The Court also declined to revisit its 1997 holding that "the Treaty of 1842 and Indian Law § 6 bar the taxation of reservation land, but do not bar the imposition of . . . 'sales taxes on cigarettes . . . sold to non-Indians on the Seneca Nation's reservations' " (id. at 1637, quoting Matter of New York State Dept. of Taxation & Fin. v Bramhall, 235 AD2d 75, 85 [4th Dept 1997]).
This Court granted plaintiffs leave to appeal (28 NY3d 1170 [2017]).
II.
In 2010, the legislature amended Tax Law §§ 471 and 471-e and the Department of Taxation and Finance adopted implementing regulations. The law provides that a tax must be paid "on all cigarettes possessed in th[is] state by any person for sale, except that no tax shall be imposed on cigarettes sold under such circumstances that this state is without power to impose such tax, including sales to qualified Indians for their own use and consumption on their nations' or tribes' qualified reservation" (Tax Law § 471 [1]). Under the amended tax law, the Department "precollects" the tax on nonexempt cigarettes from state-licensed stamping agents who purchase tax stamps from the State and affix the stamps to each package of cigarettes to demonstrate payment of the tax (Tax Law § 471 [2]; 20 NYCRR 74.3 [a] [1] [iii]; [2]). Agents incorporate the cost into the pack's price, which is passed along the distribution chain to the consumer who bears "the ultimate incidence of and liability for" the tax (Tax Law § 471 [2], [3]; see Oneida Nation of N.Y. v Cuomo, 645 F3d 154, 158 [2d Cir 2011]). As a result, although tribal retailers must prepay the tax to wholesalers when purchasing inventory, they ultimately recoup the tax by adding it to the retail price for cigarettes sold to nonmembers of the Nation. The law also permits tribes or reservation retailers to purchase a limited quantity of cigarettes{**31 NY3d at 549} based on their "probable demand" without prepaying the tax to wholesalers (see Tax Law § 471 [1], [5] [a], [b]).[FN2] III.
We agree with the courts below, and the Second Circuit, that the law's prepayment obligation does not constitute a direct tax on tribal retailers and is therefore not prohibited by federal law (see Oneida Nation, 645 F3d at 168-169).
There is a long history of legal challenges to attempts by individual states, including New York, to tax transactions taking place on Indian land (see Milhelm Attea & Bros., 512 US at 64; Oklahoma Tax Comm'n v Citizen Band of Potawatomi Tribe of Okla., 498 US 505 [1991]; Washington v Confederated Tribes of Colville Reservation, 447 US 134, 160-161 [1980]; Moe v Confederated Salish & Kootenai Tribes of Flathead Reservation, 425 US 463 [1976]; see also Cayuga Indian Nation of N.Y. v Gould, 14 NY3d 614, 622-629 [2010] [discussing New York's efforts to tax cigarette sales made on reservations to non-Indians]). In assessing these challenges, the Supreme Court has made clear that federal law prohibits states from taxing cigarette sales to enrolled tribal members on their own reservations for personal use, but permits states to tax on-reservation cigarette sales to persons other than reservation Indians (see Moe, 425 US at 475-481; Milhelm Attea & Bros., 512 US at 64). In Moe, the Supreme Court upheld a precollection tax scheme that required the cigarette seller to prepay the tax and pass the cost on to the purchaser (425 US at 483). The tribe argued that the prepayment of the tax constituted an impermissible tax on the tribal retailer. The Court rejected that argument because the tax was, as New York's is, ultimately borne by the non-Indian consumer (id. at 481-482). The Court explained that the precollection scheme was "not, strictly speaking, a tax at all," and was a "minimal burden" on tribes "to avoid the likelihood that in its absence non-Indians purchasing from the tribal seller will avoid payment of a concededly lawful tax" on {**31 NY3d at 550}non-Indians (id. at 483; see Milhelm Attea & Bros., 512 US at 73, 76).
This Court recognized these guiding principles in considering a challenge based on federal law to a requirement that an enrolled member of the Seneca Nation collect and remit sales, use and excise taxes on sales of cigarettes and gasoline made on the reservation to non-Indian consumers (Snyder v Wetzler, 84 NY2d 941 [1994]). In rejecting that challenge, we noted that the "Supreme Court has clearly established that State tax statutes requiring Indian retailers to collect and remit taxes on sales to non-Indian purchasers, and to keep the records necessary to ensure compliance, violate neither the Commerce Clause nor the constitutional proscription against direct taxation of Indians" (id. at 942). And, in Oneida Nation, the Second Circuit, in considering a request for a preliminary injunction with respect to the tax laws at issue here, found a failure to demonstrate a likelihood of success on the merits with respect to claims that "the precollection scheme impermissibly imposes a direct tax on tribal retailers, or alternatively, [that it] imposes an undue and unnecessary economic burden on [those] retailers" (645 F3d at 175). As the Second Circuit noted, "it is only the legal burden of a tax—as opposed to its practical economic burden—that a state is categorically barred by federal law from imposing on tribes or tribal members" (Oneida Nation, 645 F3d at 168 [emphasis omitted]). The express language of New York's tax law provides that "the ultimate incidence of and liability for the tax shall be upon the consumer," and mandates that the tax money advanced by any "agent or dealer" be paid back by [*3]the consumer (Tax Law § 471 [2], [3]; see Cayuga Indian Nation, 14 NY3d at 647).[FN3] Accordingly, New York's "precollection scheme is materially indistinguishable from those upheld in Moe and Colville" (Oneida Nation, 645 F3d at 169; see Milhelm Attea & Bros., 512 US at 76).
IV.
With any challenge to the precollection mechanism based on federal law effectively foreclosed, plaintiffs look to the Treaty and Indian Law § 6 for support. Neither the Treaty nor the statute provides plaintiffs the relief sought.{**31 NY3d at 551}
It is well-established that statutes and treaties with Indians "are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit" (Montana v Blackfeet Tribe, 471 US 759, 766 [1985]; see also County of Yakima v Confederated Tribes and Bands of Yakima Nation, 502 US 251, 269 [1992]), and that the words used must be understood "in the sense in which they would naturally be understood by the Indians" (Washington v Washington State Commercial Passenger Fishing Vessel Assn., 443 US 658, 676 [1979] [internal quotation marks and citations omitted]). However, "[t]he canon of construction regarding the resolution of ambiguities in favor of Indians . . . does not permit reliance on ambiguities that do not exist" (South Carolina v Catawba Tribe, Inc., 476 US 498, 506 [1986]).
Article 9 of the Buffalo Creek Treaty of 1842 provides:
"The parties to this compact mutually agree to solicit the influence of the Government of the United States to protect such of the lands of the Seneca Indians, within the State of New York, as may from time to time remain in their possession from all taxes, and assessments for roads, highways, or any other purpose until such lands shall be sold and conveyed by the said Indians, and the possession thereof shall have been relinquished by them" (7 US Stat 586, 590 [emphasis added]).
Section 6 of the Indian Law, which was derived from the Treaty and is entitled "Exemption of reservation lands from taxation," provides:
"No taxes shall be assessed, for any purpose whatever, upon any Indian reservation in this state, so long as the land of such reservation shall remain the property of the nation, tribe or band occupying the same" (emphasis added).
The plain language of both the Treaty and Indian Law § 6 establishes that they only apply to "taxes." There is no "ambiguity" here. As noted above, the pre[*4]collection mechanism at issue here is not a tax on the retailer and is borne instead by the non-Indian consumer. Neither the Treaty nor the statute supports an argument that any indirect impact on Indian retailers resulting from permissible taxation of non-Indian customers is prohibited.{**31 NY3d at 552}
V.
Tax Law § 471 does not constitute a tax on an Indian retailer, and therefore it does not run afoul of the plain language of the Treaty or Indian Law § 6. As a result, we need not address plaintiffs' claim that the Treaty and statute prohibit more than the assessment of taxes on real property within the reservation. For the same reason, we decline to address plaintiffs' argument that the tax law cannot be reconciled with the Supreme Court's decision in The New York Indians (5 Wall [72 US] 761 [1867]). Accordingly, the order of the Appellate Division, insofar as appealed from, should be affirmed, with costs.
Chief Judge DiFiore and Judges Rivera, Stein, Fahey, Wilson and Feinman concur.
Order, insofar as appealed from, affirmed, with costs.

Footnotes

Footnote 1:To conform with the treaty and statutes at issue, and with the phrasing adopted by the parties, the term "Indians" will be used to refer to the members of the Seneca Nation, or more generally, Native Americans.

Footnote 2:In 2011, it was estimated that New York would generate approximately 110 million dollars in annual tax revenue if it curbed tax evasion linked to cigarette sales on reservations (see Oneida Nation of N.Y. v Cuomo, 645 F3d 154, 159 [2d Cir 2011]). As an example of potential lost revenue, in 2009, the year before passage of the statutory provisions at issue here, the Seneca Nation had approximately 8,000 members and a yearly probable demand of 67,500 cartons of cigarettes, yet that year alone, the Seneca Nation purchased 10 million untaxed cartons from state-licensed distributors (id. at n 6).

Footnote 3:The Supreme Court has "suggested that such dispositive language from the state legislature is determinative of who bears the legal incidence of a state excise tax" (Wagnon v Prairie Band Potawatomi Nation, 546 US 95, 102 [2005] [internal quotation marks and citations omitted]).