10-1926(L), 10-1951
United States v. Morrison

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2011

(Argued: November 9, 2011                    Decided: July 16, 2012)

Docket Nos. 10-1926(L), 10-1951

———————————————————

UNITED STATES OF AMERICA,

*Appellant-Cross-Appellee*,

− v. −

RODNEY MORRISON,

*Defendant-Appellee-Cross-Appellant*.

———————————————————

Before: CALABRESI, CHIN, and CARNEY, *Circuit Judges*.

The government appeals an order of the district court (Denis R. Hurley, *J.*) vacating, on grounds of statutory vagueness, Defendant-Appellee Rodney Morrison's conviction for conspiracy pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d),  the federal Contraband Cigarette Trafficking Act ("CCTA"), 18 U.S.C. § 2341 *et seq*., and New York Tax Law § 471. Morrison cross-appeals, claiming, *inter alia*, that New York's long-running formal policy of "forbearance" from enforcing taxes on cigarettes sold on Native American reservations renders the CCTA inapplicable to the conduct on which his conviction was predicated and thus provides an alternative ground for vacating that conviction. We hold that the district court erred in vacating Morrison's conviction on vagueness grounds. In this respect, we rule that the predicate for the district court's decision—our Court's certification of questions of New York tax law to the New York Court of Appeals in *City of New York v. Golden Feather Smoke Shop, Inc.*, 597 F.3d 115 (2d Cir. 2010)—was not a proper basis for a finding of vagueness in New York Tax Law § 471, and thereby, in the CCTA as applied to Morrison. We hold also that the CCTA remains applicable to Morrison's conduct in this case,

despite New York's "forbearance policy." Finally, we find the remainder of Morrison's claims to be without merit.

Reversed in part and affirmed in part.

JAMES M. MISKIEWICZ, Assistant United States Attorney (David C. James, John J. Durham, and Diane Leonardo Beckman, Assistant United States Attorneys, *on the brief*), *for* Loretta E. Lynch, United States Attorney for the Eastern District of New York, Brooklyn, N.Y., *for Appellant-Cross-Appellee*.

RICHARD WARE LEVITT (Yvonne Shivers and Dean M. Solomon, *on the brief*), Levitt & Kaizer, New York, N.Y., *for Defendant-Appellee-Cross-Appellant*.

.

_____

CALABRESI, *Circuit Judge*:

After a jury convicted him of one count of conspiracy, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d), and one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g), Defendant-Appellee-Cross-Appellant Rodney Morrison filed several motions to vacate his convictions and dismiss the charges against him. The district court (Denis R. Hurley, *J.*) granted the last of these motions. It kept the firearm conviction in place, but vacated Morrison's RICO conspiracy conviction and dismissed the conspiracy count from his indictment. According to the court, the government's attempt to prosecute Morrison for conspiracy to violate the Contraband Cigarette Trafficking Act ("CCTA"), 18 U.S.C. § 2341 *et seq.*, failed for unconstitutional vagueness in New York Tax Law § 471, the state law that, in this case, delineated the parameters of a violation of the CCTA. The district court found Section 471 unconstitutionally vague given an earlier decision by our Court to certify to New York's Court of Appeals questions regarding New York's taxing power

2

under that section. *See City of New York v. Golden Feather Smoke Shop, Inc.*, 597 F.3d 115, 125-28 (2d Cir. 2010) ("*Golden Feather II*").

The government timely appealed the district court's order, arguing that the *Golden Feather II* decision was not a valid basis for a finding of vagueness in Section 471. Morrison cross-appealed. He seeks, first, affirmance of the district court's decision vacating his conspiracy conviction. He also challenges, on a cavalcade of grounds, the district court's earlier denials of other motions to dismiss the conspiracy charges against him and/or vacate his conspiracy conviction. Finally, Morrison requests vacatur of his firearm conviction and dismissal of the corresponding charge.

Of the many arguments that the parties have raised, only two warrant extended discussion. The first is the government's contention that the district court erred in vacating Morrison's conspiracy conviction on the ground of vagueness. The second is Morrison's claim that the CCTA was inapplicable to him given New York's "forbearance policy," under which the State refrained from collecting taxes on cigarette sales transacted on Native American reservations. According to Morrison, this forbearance policy barred his conviction under the CCTA because that statute provides that, in order for a federal prosecution to lie, the state in which the allegedly contraband cigarettes are found must "require" tax stamps to be placed on cigarettes. We reverse the district court's order vacating Morrison's RICO conspiracy conviction and reject all of Morrison's challenges to his convictions.

**BACKGROUND**

**1. The Offense Conduct**

Morrison was the managing partner of the Peace Pipe Smoke Shop, which sold cigarettes on the Unkechauge Indian Nation's Poospatuck Indian Reservation, in Mastic, New York.[1] Peace Pipe's revenue came principally from the sale of untaxed cigarettes. Morrison advertised his cigarette-selling business throughout nearby New York City. While Morrison sold some of these untaxed cigarettes over the counter at Peace Pipe or through the internet, he also made frequent, large wholesale transactions with individuals whom he called "Big Customers." These sales often involved quantities of cigarettes in excess of 60,000. All told, revenues from sales to Big Customers from 1999 through 2004 amounted to more than $138 million. Peace Pipe's employees typically delivered cigarettes to Big Customers in large black plastic bags to conceal the items. The ledgers in which Morrison recorded Peace Pipe's sales referred to his Big Customers solely by pseudonyms. At least some of Morrison's Big Customers re-sold the cigarettes they bought from Peace Pipe at off-reservation locations, and Morrison was aware that they were doing this.

**2. The Superseding Indictment**

On July 11, 2006, a federal grand jury in the Eastern District of New York returned a Superseding Indictment against Morrison. The Indictment identified Morrison as the leader of a RICO enterprise that, over an eight-year span from October 1996 to September 2004, he and others operated through Peace Pipe. The Indictment contained eleven counts against Morrison, *inter alia*: (a) conducting and participating in the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c) (hereafter referred to as the "substantive RICO count" or "Count One"); (b) entering into a racketeering conspiracy, in violation of 18

_____
[1] The parties dispute whether Morrison is properly characterized as a co-owner of Peace Pipe.

U.S.C. § 1962(d) (hereafter referred to as the "RICO conspiracy count" or "Count Two"); and (c) two counts of illegal possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) (hereafter referred to as the "firearm counts" or "Counts Eight and Nine"). In support of its charges under the substantive RICO and RICO conspiracy counts, the government alleged eighty predicate racketeering acts. Of these, acts four through eighty alleged seventy-seven separate sales of contraband cigarettes in violation of 18 U.S.C. § 2342(a)—one component of the CCTA, which prohibits trafficking in "contraband cigarettes or contraband smokeless tobacco"—and 18 U.S.C. § 2, which makes criminal aiding or abetting the commission of an offense against the United States. According to the Superseding Indictment, these predicate sales occurred between January 8, 1997 and August 2, 2004.

**3. Morrison's Multiple Challenges to the Superseding Indictment and Verdict**

At the close of the government's case, Morrison filed a Fed. R. Crim. P. 29 motion to dismiss the CCTA racketeering acts alleged to support the substantive RICO count. The district court granted Morrison's motion, finding that the government's evidence failed to establish that the parties who had purchased cigarettes from Morrison subsequently sold them in quantities sufficient to constitute independent violations of the CCTA. Morrison then moved to dismiss on collateral estoppel grounds the same racketeering acts from the RICO conspiracy count, but the court denied that motion. The trial proceeded from there, with the jury ultimately convicting Morrison of one count of RICO conspiracy (Count Two) and one count of unlawful possession of a firearm as a convicted felon (Count Eight).

Following the verdict, Morrison filed several more motions. The most important of these were motions to dismiss the racketeering acts from the remaining RICO conspiracy count (on the same collateral estoppel grounds that Morrison had raised before) and to dismiss the RICO

conspiracy count altogether as void for vagueness as applied to him. The district court rejected these motions. *See United States v. Morrison*, 596 F. Supp. 2d 661, 672-706 (E.D.N.Y. 2009) ("*Morrison I*"). After New York's Fourth Department issued its opinion in *Cayuga Indian Nation v. Gould*, 66 A.D.3d 100, 884 N.Y.S.2d 518 (4th Dep't 2009) ("*Cayuga I*"), Morrison filed for reconsideration. Morrison claimed that *Cayuga I* barred the prosecution's theory in his case. In a bench decision of August 11, 2009, the district court rejected this motion. Morrison again moved for reconsideration, but was again rejected.

When our Court decided *Golden Feather II*, 597 F.3d 115, Morrison filed yet another motion for reconsideration of his RICO conspiracy conviction. In *Golden Feather II*, we certified two questions to the New York Court of Appeals regarding New York Tax Law Sections 471 and 471-e. 597 F.3d at 127-28. Morrison claimed that our decision to certify indicated that both Section 471 and the CCTA were void for vagueness as applied to his case. The district court agreed with Morrison and, on April 16, 2010, vacated his conviction for RICO conspiracy. *See United States v. Morrison*, 706 F. Supp. 2d 304, 313-14 (E.D.N.Y. 2010) ("*Morrison II*").

On May 7, 2010, the district court sentenced Morrison solely on the basis of his firearm conviction. Morrison received a sentence of 120 months' incarceration followed by three years of supervised release. The court also levied a fine of $75,000 and a special assessment of $100.

The government timely appealed the district court's April 16, 2010 order vacating Morrison's RICO conspiracy conviction. Morrison cross-appealed, offering various grounds for vacating both of his convictions and dismissing the charges against him.

### 4. The Relevant Statutes and Their Histories

The crucial issues presented by this appeal are closely concerned with the CCTA, and, since the CCTA explicitly incorporates the tax law of the state in which the allegedly

6

"contraband" cigarettes are "found," 18 U.S.C. § 2341(2), the cigarette tax laws of the State of New York. Of particular importance are (a) New York Tax Law § 471, (b) its long judicial, legislative, and political history, and (c) this Court's prior attempts to interpret that statute in light of that history.

### a. The Contraband Cigarette Trafficking Act (CCTA)

At the time of the acts alleged in the Superseding Indictment, the CCTA declared it unlawful "for any person knowingly to ship, transport, receive, possess, sell, distribute, or purchase contraband cigarettes." 18 U.S.C. § 2342(a) (West 2006) (amended 2006). Section 2341(2), in turn, defined "contraband cigarettes" as:

> a quantity in excess of 60,000 cigarettes, which bear no evidence of the payment of applicable State cigarette taxes in the State where such cigarettes are found, if such State requires a stamp, impression, or other indication to be placed on packages or other containers of cigarettes to evidence payment of cigarette taxes, and which are in the possession of any person other than [individuals or entities falling within one of four exceptions].

18 U.S.C. § 2341(2) (West 2006).[2]

### b. New York Tax Law § 471

Pursuant to Section 2341(2), state tax laws delineate the parameters of a violation of the CCTA. At the time of the relevant conduct alleged in the Superseding Indictment, Section 471 of the New York State Tax Law read in relevant part:

> There is hereby imposed and shall be paid a tax on all cigarettes possessed in the state by any person for sale, except that no tax shall be imposed on cigarettes sold under such circumstances that this state is without power to impose such tax . . . . It shall be presumed that all cigarettes within the state are subject to tax until the contrary is established, and the burden of proof that any cigarettes are not taxable hereunder shall be upon the person in possession thereof.

N.Y. Tax Law § 471(1) (McKinney 2008) (amended 2008, 2010).

---

[2] Congress amended the CCTA in March 2006, reducing the threshold quantity of cigarettes from 60,000 to 10,000. *See* USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. 109-177, § 121(a)(2), 120 Stat. 192, 221 (2006).

New York Tax Section 471(2), meanwhile, described the mechanism through which New York collected taxes on all cigarettes that the state has the power to tax. Under this statutory structure, an "agent" advanced money to the State in return for tax stamps, which the agent subsequently applied to each carton of cigarettes in his or her possession. *See* N.Y. Tax Law § 471(2) (McKinney 2010) (amended 2010). The agent then added the cost of the tax onto the cigarettes it wholesaled to retailers. Retailers passed the tax on to consumers through mark-ups over the cigarette manufacturers' suggested retail prices. Since the State had not enacted a regulation that would permit the Division of Taxation and Finance ("DTF") to collect taxes without using the tax stamp mechanism, all cigarettes that New York had the power to tax had to be stamped. *See id.*; N.Y. Tax Law § 471(1) (McKinney 2008).

### c. Dialogue and Disputes Informing Our Interpretation of Section 471

Over the course of more than three decades, all three branches of the New York State government have been engaged in dialogue with each other, with Native American retailers, and with the federal courts regarding the scope of New York's power to tax on-reservation cigarette sales. This dialogue has often been complicated, and it has, in some instances, occasioned significant conflict.[3]

Prior to 1988, despite Supreme Court precedent suggesting that the states could permissibly tax cigarettes that were sold on-reservation to non-Native Americans, New York had not attempted to collect taxes on such sales.[4] After the DTF discovered that non-Native

---

[3] For current purposes, we adopt the enforcement history set forth by the district court in its several exhaustive opinions. The parties have not contested that court's findings of fact with regard to that history.

[4] In 1980, the Supreme Court issued its opinion in *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134. There, the Court ruled that, in appropriate circumstances, the State may:

Americans were purchasing large quantities of tax-subject cigarettes from on-reservation retailers, however, it promulgated regulations to enforce the collection of taxes on those sales. Shortly after the DTF promulgated these regulations, Native American retailers sued to enjoin their enforcement. Litigation followed, with the United States Supreme Court ultimately rejecting the retailers' challenge. *See Dep't of Taxation & Fin. v. Milhelm Attea & Bros., Inc.*, 512 U.S. 61, 78 (1994). Nevertheless, just as it had during the *Milhelm Attea* litigation, the DTF followed a formal policy of "forbearance" even after that case was decided. Specifically, pursuant to this policy, the DTF did not enforce its regulations governing on-reservation sales to non-Native Americans.

In 1996, New York State Governor George Pataki announced his intention to enforce the DTF regulations. In 1997, however, he reversed his stance and ordered the DTF to repeal them. Prompting Governor Pataki's reversal was a combination of legal barriers presented by tribal immunity and the resistance of New York's Native American population. Tribal immunity prevented New York from (a) suing Native American retailers who refused to pay the tax, (b) sending auditors onto reservations to examine retailers' records, (c) compelling retailers to register their businesses with the state, or (d) requiring retailers to send their records off-reservation. When New York attempted more aggressive enforcement strategies and started intercepting and seizing cigarette shipments headed into reservations, Native Americans resisted. This resulted in civil unrest, personal injuries, and significant interference with public

---

> impose a nondiscriminatory tax on non-Indian customers of Indian retailers doing business on the reservation. Such a tax may be valid even if it seriously disadvantages or eliminates the Indian retailer's business with non-Indians. And the State may impose at least "minimal" burdens on the Indian retailer to aid in enforcing and collecting the tax.

*Id*. at 151 (footnote omitted).

transportation on New York highways. The DTF ultimately repealed its regulations in 1998. Although Governor Pataki subsequently sponsored amendments to the Tax Law that would have permitted on-reservation retailers to sell cigarettes tax-free, the New York legislature never passed such legislation. As a result, Section 471's prohibition on unstamped cigarette sales remained in effect.

The New York legislature did, however, enact other amendments to its cigarette tax laws over the course of the subsequent years. The most important of these, for our purposes, were passed in 2005. Although these amendments were enacted *after* the offense conduct involved in this case, they formed the immediate backdrop for our Court's decision in *Golden Feather II*, and, in turn, for the district court's decision to vacate Morrison's RICO conspiracy conviction.

Under Section 471-e, as amended in 2005, "[A]ll cigarettes sold on an Indian reservation to non-members of the nation or tribe or to non-Indians shall be taxed, and evidence of such tax will be by means of an affixed cigarette tax stamp." N.Y. Tax Law § 471-e(1)(a) (McKinney 2010) (subsequently amended 2010). Section 471-e also provided that "[q]ualified Indians may purchase cigarettes from a reservation cigarette seller exempt from the cigarette tax even though such cigarettes will have an affixed cigarette tax stamp." N.Y. Tax Law § 471-e(1)(b) (McKinney 2010) (subsequently amended 2010). Crucially, the notes to Section 471-e stated that it would take effect on March 1, 2006, "provided that any actions, rules and regulations necessary to implement the provisions of [the statute] on its effective date are authorized and directed to be completed on or before such date." 2005-63 N.Y. Consol. Laws Adv. Legis. Serv. *15 (LexisNexis). The DTF never did complete the necessary rules and regulations. Instead, the DTF issued an advisory opinion in which it stated that, pursuant to its forbearance policy, it would not enforce Section 471-e come March 1, 2006. *See Morrison I*, 596 F. Supp. 2d at 676.

And New York's Fourth Department subsequently ruled in *Day Wholesale, Inc. v. State of New York*, 51 A.D.3d 383, 856 N.Y.S.2d 808 (2008) that Section 471-e was not "presently in effect" due to the DTF's failure to promulgate the statutorily mandated regulations. *Id.* at 384, 389.

Shortly thereafter, in 2009, New York's Fourth Department issued *Cayuga I*, in which it ruled that: (a) Section 471-e "exclusively governs the imposition of sales and excise taxes on cigarettes sold on a qualified reservation," 66 A.D.3d at 111, (b) since Section 471-e was not "in effect," "there [was] no statutory basis for the imposition of a cigarette tax on a qualified reservation," *id.* at 110, and (c) consequently, "possession or sales of untaxed cigarettes on qualified reservations [could not] subject the seller or possessor to criminal prosecution," *id.*

A conflict soon developed between the Fourth Department and the federal court for the Eastern District of New York concerning New York's authority to tax on-reservation cigarette sales to non-tribal members. In *City of New York v. Golden Feather Smoke Shop, Inc.*, No. 08-cv-3966, 2009 WL 2612345 (E.D.N.Y. Aug. 25, 2009) ("*Golden Feather I*"), the City of New York sued a series of on-reservation cigarette retailers in federal court, seeking injunctive relief, penalties, and damages under the CCTA. The district court granted the City's motion for a preliminary injunction. *Id.* at *1. In doing so, the *Golden Feather I* court determined that "the New York Court of Appeals would reject the majority's reasoning in *Cayuga* [*I*] and conclude that § 471 imposes a tax on reservation sales of cigarettes to non-Tribe members." *Id.* at *29. The district court thus made its own interpretation of Section 471, and, under this interpretation criminal prosecutions of Native American retailers who sold untaxed cigarettes on-reservation to non-tribal members were permitted. The defendants in *Golden Feather I* appealed the district court's decision to our Court. *See Golden Feather II*, 597 F.3d 115. Rather than deciding the

issue, we sought the New York Court of Appeals' guidance in interpreting New York's Tax Law by certifying the following two questions:

> (1) Does N.Y. Tax Law § 471-e, either by itself or in combination with the provisions of § 471, impose a tax on cigarettes sold on Native American reservations when some or all of those cigarettes may be sold to persons other than members of the reservation's nation or tribe?
>
> (2) If the answer to Question 1 is "no," does N.Y. Tax Law § 471 alone impose a tax on cigarettes sold on Native American reservations when some or all of those cigarettes may be sold to persons other than members of the reservation's nation or tribe?

*Id*. at 127-28. In certifying, we noted that oral arguments in the *Cayuga* suit were pending before the New York Court of Appeals and, as a result, New York's highest court might soon pass on the relevant issues. *See Golden Feather II*, 597 F.3d at 127.

On August 20, 2010, we recalled these questions as moot in light of the Court of Appeals' decision in *Cayuga Indian Nation v. Gould*, 14 N.Y.3d 614 (2010) ("*Cayuga II*"), and intervening amendments to the New York cigarette tax laws. We then remanded *Golden Feather* to the district court for further proceedings. *See* Order, *City of New York v. Golden Feather Smoke Shop*, No. 09-3942-cv (2d Cir. Aug. 20, 2010).

In *Cayuga II*, the New York Court of Appeals ruled that there was "no question that Tax Law § 471 generally imposes a sales tax on cigarettes sold in New York." 14 N.Y.3d at 647. The court observed that Section 471-e was not "in effect," *id*. at 654, and thus New York had no "overarching methodology . . . for adapting [its] tax scheme to the unique context of qualified reservation sales," *id*. at 650. This state of affairs did not, however, present barriers to prosecutions of "large-scale cigarette bootlegging activities engaged in by Indian and non-Indian traders" when such prosecutions were undertaken pursuant to Section 471 only. *Id*. at 652. Moreover, the Court of Appeals explicitly stated that the schemes involved in *Golden Feather*

and *in the case currently before us* were the kind of "large-scale bootlegging activities" that are properly subject to prosecution under Section 471. *See id*. at 653.[5]

## DISCUSSION

## I.

The first of two questions calling for discussion is whether the district court erred in concluding that our certification of questions to the New York Court of Appeals in *Golden Feather II*, 597 F.3d 115, required that Morrison's RICO conspiracy conviction be vacated on vagueness grounds. From the district court's perspective, our decision to certify questions regarding Section 471 to the New York Court of Appeals meant that this provision did not give constitutionally sufficient notice to potential criminal defendants. As a result, the district court reasoned, Morrison's conviction for conspiracy to violate the CCTA could not stand, since the conviction required a violation of Section 471. *Morrison II*, 706 F. Supp. 2d at 313. In support of its decision vacating Morrison's conspiracy conviction, the court wrote:

> Tellingly the Circuit, in framing the second question for certification, asked whether "§ 471 alone impose[s] a tax on cigarettes sold on Native American reservations when some or all of those cigarettes may be sold to persons other than members of the reservation's nation or tribe?" That question, when viewed in conjunction with the explanation that "[c]ertification . . . should be done sparingly, mindful that it is our job to predict how the New York Court of Appeals would decide the issues before us," compels the conclusion that the Circuit perceives the applicability of § 471 to on-reservation sales as unsettled and ambiguous, i.e. not self-evident nor predictable from a simple reading of the section. Also significant is the Circuit's query whether the absence of regulations setting forth a collection mechanism may be equated with "'circumstances that [render New York] without power to impose such tax,'" referencing the excepting language found in § 471.

---

[5] In February 2010, the DTF revoked its forbearance policy. In June 2010, the New York Legislature amended New York Tax Law Sections 471 and 471-e, and the DTF adopted regulations to implement the tax on on-reservation cigarette sales to non-members. *See Oneida Nation v. Cuomo*, 645 F.3d 154, 159 (2d Cir. 2011). This Court ruled against Native American tribes seeking preliminary injunctions blocking New York officials from implementing the amended cigarette tax laws. *See id*. at 164-76.

*Id.* at 312-13 (alterations in original) (internal citations omitted).

We hold first that the district court's vacatur and dismissal rests on an erroneous interpretation of *Golden Feather II*. We hold also that the factors that prompted certification in *Golden Feather II* do not justify (a) the district court's ruling that New York Tax Law § 471 is unconstitutionally vague, and, hence (b) its ruling that Morrison's RICO conspiracy conviction was constitutionally invalid.

We review *de novo* a district court's ruling that a statute is unconstitutionally vague. *See Arriaga v. Mukasey*, 521 F.3d 219, 222 (2d Cir. 2008). "As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (citing, *inter alia*, *Smith v. Goguen*, 415 U.S. 566 (1974); *Grayned v. City of Rockford*, 408 U.S. 104 (1972)).

After reviewing the arguments raised by the parties regarding the presence or absence of New York's statutory authority to tax on-reservation sales of cigarettes to non-tribal members, our Court in *Golden Feather II* assessed the prudence of issuing a ruling in the case before it. A reading of the relevant portions of *Golden Feather II* demonstrates that our concerns related there—considered singly or together—do not raise the specter of vagueness with respect to Section 471.

We framed our inquiry with reference to our opinion in *O'Mara v. Town of Wappinger*, 485 F.3d 693 (2d Cir. 2007). We explained that "[o]ur decision to certify unsettled legal questions [was] based on, among other factors: '(1) the absence of authoritative state court

14

decisions; (2) the importance of the issue to the state; and (3) the capacity of certification to resolve the litigation.'" *Golden Feather II*, 597 F.3d at 126 (quoting *O'Mara*, 485 F.3d at 698).

With regard to the first of the *O'Mara* criteria, *Golden Feather II* surveyed New York law, noting that the New York Court of Appeals "ha[d] not spoken directly on the issue of the applicability of § 471 alone to reservation cigarette sales to non-Tribal members, nor ha[d] it addressed whether § 471-e is actually in effect considering the DTF's explicit refusal to implement it with respect to reservation vendors." *Id*. Our Court acknowledged the Fourth Department's ruling in *Cayuga I*. But, we also observed that our Court is not "strictly bound by state intermediate appellate courts," and can disregard the rulings of such courts if we are "convinced by other persuasive data that the highest court of the state would decide otherwise." *Id*. (quoting *DiBella v. Hopkins,* 403 F.3d 102, 112 (2d Cir. 2005)) (internal quotation marks omitted). We rendered this observation notwithstanding the fact that, as noted above, the Fourth Department in *Cayuga I* had addressed the very issues that were points of concern to our Court. (Recall that, in *Cayuga I*, the Fourth Department had ruled that Section 471-e provided the only statutory basis for "for the imposition of a cigarette tax on a qualified reservation," that Section 471-e was not in effect, and that Section 471 alone could not support a criminal prosecution for "possession or sales of untaxed cigarettes on qualified reservations." *See* 66 A.D.3d at 110.)

In *Golden Feather II* we, in effect, predicted—correctly, as it turns out—that the New York Court of Appeals would decide differently from the Fourth Department in *Cayuga I*. And the reasons we thought this would happen substantially undercut Morrison's contention that our decision to certify reflected concerns about the statute's vagueness. In certifying, we observed that "there are a number of factors that may persuade the Court of Appeals in its review of *Cayuga* to adopt the rationale of Judge Peradotto's dissent [in *Cayuga I*]." *Golden Feather II*,

597 F.3d at 126. Most significant among these was our belief that the plain language of § 471 and § 471-e counseled in favor of the Court of Appeals reversing *Cayuga I*:

> The plain language of § 471 is that a tax is "imposed . . . on all cigarettes possessed in the state by any person for sale" except for cigarettes "sold under such circumstances that this state is without power" to tax. N.Y. Tax Law § 471. The language of § 471-e, however, only gives the state a method by which to collect the taxes actually imposed by § 471.

*Id.*

Indeed, far from suggesting that "the Circuit perceive[d] the applicability of § 471 to on-reservation sales as unsettled and ambiguous, i.e. not self-evident nor predictable from a simple reading of the section," *Morrison II*, 706 F. Supp. 2d at 313, *Golden Feather II* demonstrated our Court's strong sense that the plain language of Section 471 gave the State of New York the power to prosecute cigarette vendors for the on-reservation sale of unstamped cigarettes to non-tribal members. Undoubtedly, *Golden Feather II*'s comments regarding the plain meaning of Section 471 indicated an interpretational conflict between our Court and the Fourth Department. But it is manifest that conflicts between courts over the interpretation of a criminal statute do not in and of themselves render that statute unconstitutionally vague. *See United States v. Rybicki*, 354 F.3d 124, 143 (2d Cir. 2003) (en banc).

With regard to the second *O'Mara* criterion, *Golden Feather II* noted that a variety of state-level actors—"the New York State courts, the New York Legislature, the Department of Taxation and Finance, and . . . New York's Governor"—had addressed the "question of taxing cigarette sales on reservation lands" with "varying outcomes." 597 F.3d at 127. The existence of these varying outcomes, in turn, weighed in favor of certifying to the New York Court of Appeals, which was "in a far better position" to resolve the conflict. *Id.* In deferring to the Court of Appeals, our Court did not suggest that the question of Section 471's applicability to on-

reservation sales was either vague or hard to resolve. Indeed, as noted earlier, we indicated that we were quite capable of ruling on the issue should the New York Court of Appeals decline to accept certification. Our certification simply acknowledged that the New York Court of Appeals, being the ultimate arbiter of New York law, is the optimal body to settle state law questions, particularly when these questions are of high political significance within the State.

Finally, with respect to the third *O'Mara* criterion, our Court noted that the questions certified were "purely legal" and, in turn, that "[a]n answer from the New York Court of Appeals . . . [would] in all likelihood end this portion of the litigation." *Id*. Our analysis under this prong, like our analysis under the preceding prongs, did not speak to vagueness. Rather, the analysis sounded in our concerns with achieving judicial economy and with respecting the supremacy of New York's highest court on matters of New York law.

In sum, *Golden Feather II*'s decision to certify questions regarding Section 471 to the New York Court of Appeals did not indicate that that statute failed to describe "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender*, 461 U.S. at 357. Indeed, certification stemmed from our understanding that, while we *could* rule on the issues before us, doing so was not *prudent*. Thus, while there may be cases in which a decision to certify could be indicative of vagueness, the present case is not one. Consequently, we reverse the district court and reinstate Morrison's conviction under Count Two.[6]

## II.

The second issue meriting discussion is whether Morrison could be validly convicted under the CCTA—which criminalizes the sale of cigarettes lacking "stamp[s], impression[s], or

---

[6] Morrison raises a series of other arguments for finding the RICO conspiracy count void for vagueness as applied to him. These arguments are all without merit.

17

other indication[s]" that are "*require[d]*" by the state in which the cigarettes are found. 18 U.S.C. § 2341(2) (emphasis added)—in view of the fact that New York was refraining from enforcing taxes on on-reservation sales at the time of the conduct at issue. According to Morrison, a "forbearance" policy such as New York's constitutes, by definition, the absence of the mandated "requirement." We reject Morrison's argument and hold that the CCTA, in conjunction with New York Tax Law § 471, justified Morrison's conviction in this case.

We begin with the ordinary meaning of the word "requires" as used in the CCTA. Significantly, the Ninth Circuit and the Western District of Washington have interpreted the CCTA's use of "requires" as referring to the law as written.[7] These courts did not construe the relevant language in the context of a "forbearance policy" like New York's. But, a district court within our circuit has done just that, and has given the CCTA's "requires" language that same meaning in the specific setting of New York's forbearance policy. *See City of New York v. Milhelm Attea & Bros., Inc.*, 550 F. Supp. 2d 332, 346 (E.D.N.Y. 2008) (rejecting the argument that New York's forbearance policy rendered New York Tax Law § 471 inapplicable to wholesalers selling to reservation retailers). These rulings reinforce our own conclusion that the normal meaning of "required," as contained in the CCTA, is what is mandated by the state statute (Section 471), and not what is enforced by the state executive.

There is, of course, no question that the conduct at issue here was made unlawful by the terms of New York's cigarette tax laws. At the time of the events that form the basis of

[7] *See, e.g.*, *United States v. Fiander*, 547 F.3d 1036, 1038-39 (9th Cir. 2008) (citing Wash. Rev. Code Ann. §§ 82.24.010, -.030(1)-(2), -.250(7); Wash. Admin. Code § 458-20-192); *United States v. Smiskin*, 487 F.3d 1260, 1263 (9th Cir. 2007) (citing Wash. Rev. Code Ann. §§ 82.24.030, -.250(1)); *United States v. Gord*, 77 F.3d 1192, 1193 (9th Cir. 1996) (citing Wash. Rev. Code Ann. §§ 82.24.030, -.050; Wash. Admin. Code § 458-20-192); *United States v. Baker*, 63 F.3d 1478, 1486-87 (9th Cir. 1995) (citing Wash. Rev. Code Ann. §§ 82.24.020, -.030, -.130(1)(a); Wash. Admin. Code § 458-20-192); *United States v. Montour*, No. CR09-214 MJP, 2010 WL 2293143, at *3-4 (W.D. Wash. May 3, 2010) (citing Wash. Rev. Code Ann. §§ 82.24.020(5), -.030(1), -.130(1)(a), -.250(1)-(4); Wash. Admin. Code § 458-20-186(506)).

Morrison's prosecution, New York State imposed a tax on all cigarettes sold within the state, with an exception for those sales where the state was "without power to impose such a tax." N.Y. Tax Law § 471(1). The Supreme Court had held that the states could properly impose taxes on cigarettes that were sold on reservation to non-Native Americans. *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 151 (1980). Moreover, the Court had specifically upheld New York's tax regime, as it pertained to on-reservation cigarette sales to non-Native Americans. *See Milhelm Attea*, 512 U.S. at 78. Consequently, New York's decision, for political and practical reasons, to refrain from enforcing Section 471 did not grant Morrison leave to sell massive quantities of untaxed cigarettes to non-Native Americans. New York had the power to impose that tax and state law mandated that the tax be paid. New York's forbearance policy did not free him to engage in conduct that the law forbade, for, as the Supreme Court has stated, "The failure of the executive branch to enforce a law does not result in its modification or repeal." *District of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 113-14 (1953).

To the extent that New York's forbearance policy might be said to create some ambiguity regarding the scope of Native American cigarette retailers' tax liability for on-reservation cigarette sales, Morrison's actions went far beyond the sort of conduct that might be in any area of ambiguity. He engaged in a substantial wholesale business, with some 50,000 "Big Customers" who together purchased more than $138 million in cigarettes from 1999 through 2004. He encouraged these sales by distributing fliers throughout New York City. All the while, he knew that at least some of these "Big Customers" were re-selling the cigarettes off-reservation. And, as the New York Court of Appeals has ruled, this kind of "large-scale cigarette bootlegging," involving "the wholesale distribution of untaxed cigarettes destined for off-

reservation sales," *Cayuga II*, 14 N.Y.3d at 652-53, constituted the *core* conduct that Section 471 criminalized. *Id*. at 650-51, 653.

There is, however, one additional issue we should consider before finally concluding that the CCTA applies to Morrison. Congress designed the CCTA to provide federal support to the states in enforcing their tax laws. *See* S. Rep. No. 95-962, at 9 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5518, 5524. The design of the CCTA as a federal statutory "back-up" for state-level enforcement regimes stemmed from Congressional concerns regarding (a) federal-state relations and (b) limitations in federal resources. *Id*. at 5523-24. In order to maintain a proper federal-state balance, encourage the states to take the lead in prosecuting cigarette trafficking, and reduce the financial burden likely to be borne by the federal government, the CCTA empowered the federal government to deal only with major trafficking infractions. *Id*. at 5527-28.[8]

In light of the CCTA's design as a "back-up" measure, a defendant might argue that where a state passed a law criminalizing cigarette trafficking, but had no intention of enforcing it

---

[8] In a letter incorporated into the Senate Report accompanying the CCTA, the Department of Justice explained its previous resistance to earlier CCTA-like anti-trafficking bills and its reasons for endorsing what ultimately became the CCTA:

> As you know, in the past the Department has opposed legislation like S. 1487. This opposition existed for two valid reasons. First, the Department believed that before there is a significant expansion of federal criminal jurisdiction into an area hitherto reserved to the states, there should be a strong showing that the states have made significant, but unsuccessful, attempts to deal with the problem involved. In the past, the evidence had been that the states most affected by cigarette smuggling had not made significant attempts to deal with the problem. Second, past administrations have not wanted to incur the costs, both investigative and prosecutorial, that would go with taking on primary enforcement responsibility for the collection of state cigarette taxes from interstate distributors and sellers of cigarettes. It was believed that passage of legislation like S. 1487 would create strong pressure for the assumption of that responsibility.

S. Rep. 95-962 at 11, *reprinted in* 1978 U.S.C.C.A.N. 5518, 5526.

(and indeed did not enforce it), the CCTA would not apply. If these were the circumstances before us, we might face a conflict between the seemingly plain meaning of "requires" and its meaning in the context of the CCTA. But, that is not the situation here. As shown by the extensive history that the district court compiled in its many thorough opinions, New York's forbearance policy operated against the background of repeated—and frequently very aggressive—attempts by the state government to curb bootlegging.

As noted above, New York's DTF, in 1988, instituted regulations to govern the collection of taxes from non-Native American purchasers who bought cigarettes on reservations from Native American retailers. When the Native American retailers threatened a legal challenge to the regulations, the DTF withheld implementing these regulations. Although the Supreme Court ultimately ruled that the regulations were legal, the DTF was still effectively powerless to enforce them. It was rendered powerless because, even after long negotiations with the retailers, the DTF was unable to compel or convince the retailers to participate in its auditing scheme. And when—in the face of the non-cooperation of Native American retailers—New York began a program of highway interdiction, its actions were disastrously unsuccessful, "result[ing] in civil unrest, personal injuries and significant interference with public transportation on the State highways." *Morrison I*, 596 F. Supp. 2d at 672 (quoting *N.Y. Ass'n of Convenience Stores v. Urbach*, 275 A.D.2d 520, 522-23, 712 N.Y.S.2d 220, 222 (3d Dep't 2000)). It was only after these failed interdiction efforts that Governor Pataki ordered the repeal of the DTF regulations. Section 471 and its requirements remained in effect, however.

In view of this history, the forbearance policy in no way signaled New York's choice not to enforce its tax laws when such enforcement would be possible. Rather, the policy represented New York's beleaguered concession to the difficulty and danger of state-level enforcement, the

complex jurisdictional issues surrounding reservation-based cigarette sales, and the politically combustible nature of bootlegging prosecutions. Congress enacted the CCTA to provide federal support to states struggling with circumstances precisely like those that prompted New York's forbearance. Accordingly, we conclude that by sustaining Morrison's conviction, we are in no way undercutting the CCTA's back-up role, but rather, are giving fullest effect to the CCTA's delicate balancing of state and federal interests.

**III.**

Morrison's consolidated brief raises eight additional arguments: first, that *Cayuga II* barred the government from using New York Tax Law § 471 to prosecute the possession and sale of untaxed cigarettes on Native American reservations; second, that the district court erred in denying Morrison's motion, under Fed. R. Civ. P. 29 and collateral estoppel principles, to dismiss the CCTA racketeering acts from his RICO conspiracy count; third, that a valid conviction under the CCTA required the government to show that Morrison had knowledge that he was selling "contraband" cigarettes; fourth, that the government, in order to secure a valid conviction for conspiracy to violate the CCTA, was required to prove that Morrison was aware of the unlawful character of his agreement with his co-conspirators; fifth, that the Native American status of Morrison's alleged customers was an element of, rather than an affirmative defense to, the crime of trafficking as defined by the CCTA; sixth, that the district court's jury instructions constructively amended Count Eight of Morrison's Superseding Indictment, which charged him with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g); seventh, that Morrison's conviction under Count Eight was obtained in violation of the Commerce Clause; and eighth, that the district court's use of acquitted conduct to set Morrison's sentence violated his Fifth and Sixth Amendment rights. We find each of these arguments

meritless and affirm the district court's rulings on these contentions, essentially for the reasons it gave.

**CONCLUSION**

Accordingly, we *reverse* the district court's vacatur of Morrison's RICO conspiracy conviction, *affirm* his conviction under 18 U.S.C. § 922(g), and *remand* the case to the district court for sentencing on the RICO conspiracy count.